# ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020-1182
Todd E. Duffy
Dennis J. Nolan
Tel: (212) 278-1000
Fax: (212) 278-1733
*Proposed Attorneys for the Debtor and*
 *Debtor-in-Possession*

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | |
|---|---|
| ------------------------------------------------------------x <br> In re: <br><br> PETER MATT & CO., INC. <br><br> Debtor. <br><br> ------------------------------------------------------------x | Chapter 11 <br><br> Case No. 09-23634 (RDD) |

**DEBTOR'S REPLY IN RESPONSE TO OBJECTION OF FCC, LLC TO DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 361(2) AND 363(c)(2), FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001 AND LOCAL BANKRUPTCY RULE 4001-2 FOR AN ORDER (A) AUTHORIZING INTERIM USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITOR, AND (C) SCHEDULING A FINAL <u>HEARING TO CONSIDER ENTRY OF FINAL ORDER</u>**

Peter Matt & Co., Inc., as debtor and debtor-in-possession (the "Debtor"), hereby submits this Reply in response to FCC, LLC ("FCC")'s Objection to Debtor's Motion for Use of Cash Collateral and in Opposition to FCC's Motion Pursuant to Sections 105 and 362(d)(1) of the Bankruptcy Code to Lift the Automatic Stay (the "Objection"), and respectfully represents the following:

**PRELIMINARY STATEMENT**

1.  Through misrepresentation, distortion of fact and feigned ignorance of the circumstances that has put the Debtor in a perilous position, FCC seeks to mask both that it is adequately protected and that it bears significant culpability for the Debtor's current situation.

Indeed, the Objection merely highlights FCC's tact over the past twelve months – force a slow liquidation of the Debtor solely to satisfy its own secured debt in reckless disregard of the other creditors. For its own benefit, FCC has done everything it can to drive the Debtor into the ground and, having failed at that, now asserts, falsely, that this company cannot be saved.

2. It is laughable that having spent the better part of the last year interfering in the Debtor's business operations, forcing the Debtor to sell its collateral below cost and preventing it from purchasing new inventory to satisfy its business model, FCC has the temerity to claim, after only two weeks in bankruptcy, that the Debtor cannot rehabilitate itself. The sole reason the Debtor required the protection of this Court is because of FCC's money grab. While the Debtor fell behind on its payment obligations to vendors and other creditors, FCC enjoyed almost a fifty percent reduction of its debt through its forced approach. Indeed, FCC has paid itself back from a $6.25 million loan balance in October 2008 to less than $3.2 million today through explicit instructions to sell inventory regardless of profits or consequences.

3. FCC's attempts to divert the Court's attention with speculation and fuzzy math do not change several facts. First, FCC is so sufficiently oversecured that it is not entitled to any adequate protection payments (although the Budget provides for the payment of interest to FCC) and that the value of its collateral will most likely increase to the extent that Debtor is finally able to purchase the additional inventory it needs. Second, in spite of FCC's attempts to liquidate this business, the Debtor could, with the use of cash collateral, grow its inventory – which would grow FCC's collateral – and simultaneously grow its profit. Accordingly, the Court must overrule FCC's objection and grant the Debtor use of its cash collateral.

**FACTUAL BACKGROUND**

4. On August 25, 2008, FCC and the Debtor entered into the Pre-Petition Loan and Security Agreement, annexed as Exhibit A to the Cash Collateral Motion (the "FCC Loan Agreement"). Pursuant to the FCC Loan Agreement, the Debtor was able to borrow a percentage of the value of inventory. Given the seasonal nature of the Debtor's business, the FCC Loan Agreement provided for a seasonal adjustment to the lending formula. The lending formula was supposed to be increased to 60% of eligible inventory from July 1 through October 31. Yet, during the period July 1, 2009 through the Petition Date, FCC refused to lend to the Debtor at this rate as provided for in the Loan Agreement and offered only to lend at a rate of 50% of eligible inventory, which further hamstrung the Debtor's efforts to purchase adequate inventory.

5. Despite being in the throes of one of the worst recessions in the nation's history, the Debtor's revenues in 2008 increased approximately 2% over 2007. While FCC sneers at this modest gain, this increase was above the industry norm. Had the Debtor been left to its own devices, it would likely have continued at that pace. However, the Debtor's financial performance began to deteriorate significantly after it entered into the FCC Loan Agreement because FCC began squeezing the Debtor almost from the moment the parties entered into the FCC Loan Agreement to reduce its inventory. In early November 2008, as the parties negotiated to continue the funding advance rate at 60%, FCC ordered a rapid sale of inventory at reduced rates, otherwise FCC would fund only at 50% of eligible inventory. FCC believed the Debtor had too much inventory and was not turning its inventory quickly enough. Specifically, FCC ordered the Debtor to reduce inventory from over $9 million in August 2008 to $7 million by December 2008 (which the Debtor did) and to further reduce inventory to $5 million by October

2009 (as of the Petition Date, inventory was $5.8 million). During this period, despite the fact that the Debtor acquiesced to reducing its inventory, FCC failed to increase the advance rate to 60%.

6. As a direct consequence of FCC's actions, not only was the Debtor's inventory drastically reduced, the outstanding balance due to FCC on its loan was reduced from $6,250,000 to less than $3.2 million. Only FCC benefited from this slow liquidation, which by FCC's own admission was its exact intention. Indeed, in conversations with FCC executives, FCC executives expressed directly to the Debtor's CEO and its board of directors that it "wanted out" of the FCC Loan Agreement presumably at any cost to the Debtor and its remaining creditors. The Debtor, and its remaining creditors, in turn, suffered dramatically as a result.

7. It is patently obvious that since day one, FCC has never understood the Debtor's business[1]. FCC's total lack of knowledge of the retail wine industry and its decision to insinuate itself into the day to day operations of the Debtor's business, was the sole cause of the deterioration of the Debtor's business. FCC forced the Debtor to take steps that ran contrary to the Debtor's business model and that prevented the Debtor from enjoying significant revenue and healthy profits. While revenue has declined by approximately 24% in the first eight months of 2009, this decline is directly attributable to FCC's actions and demands.

8. Had FCC understood the retail wine industry, it would have realized that the Debtor would thrive if it were allowed to <u>increase</u> certain types of inventory, rather than forcing the Debtor to sell inventory at greatly reduced rates. For the Court, and FCC's, edification, a

---

[1] FCC's fundamental misunderstanding of the Debtor's business is evidenced by FCC's inaccurate characterization of the Debtor as an importer and distributor of wines "mainly to the restaurant trade." <u>See</u> the Objection at ¶3. In fact, only twenty percent of the Debtor's business comes from restaurants and the remaining eighty percent comes from non-restaurant retailer and distributors. FCC conjures up this idea of the Debtor's business in an effort to tie the Debtor into the suffering restaurant industry, rather than into retail, which is one of very few industries actually experiencing.

brief description of the Debtor's inventory classes is necessary. The Debtor has three categories of inventory: (1) boutique, high-end, vintage wines, which are expensive, rare and enticing wines (the "Boutique Wines"); (2) highly rated wines which are not necessarily expensive, but which have been given a high rating by Wine Spectator and similar rating organizations and which are highly coveted by retailers (the "Highly Rated Wines"); and (3) private label wines, which comprises 50% of the Debtor's inventory and 60% of its retail sales (the "Private Label Wines").

9. In the face of FCC's squeeze play, the Debtor's reduced its supply of Boutique Wines from $1.4 million at the close of the FCC Loan Agreement to approximately $500,000 today. As a result, the Debtor has had great difficulty opening new accounts, because its target market desires a purveryor who sells high cache wines.

10. In addition, FCC undercut the Debtor's ability to sell its Private Label Wines. Pursuant to industry practice, Private Label Wines can usually turn only once a year, meaning they are made once a year and can only be ordered once a year. Contrary to a widget distributor, a wine distributor cannot replenish its stock and it therefore usually has a high level of inventory so that it would have sufficient amounts to sell during the entire year. Because FCC forced the Debtor to reduce its inventory, the Debtor is now out of stock of many of its Private Label Wines.

11. In order to maximize profits, the Debtor usually bundles its wines; in particular, the Debtor bundles its Private Label Wines with Highly Rated Wines. Since the Highly Rated Wines are most desirable, the Debtor, for example, would offer two cases of the Highly Rated Wines if the retailer agreed to purchase ten cases of the Private Label wines. This would generate significantly greater revenue than if the Debtor were to sell only its Private Label

Wines. If the Debtor offered a retailer five cases of its Private Label Wines at $96 per case, the retailer might purchase three cases at a total cost of $288. The Debtor enjoys a thirty-percent profit margin on that sale, giving it a gross profit of approximately $86 on the transaction. However, if it could bundle two cases of Highly Rated Wines (where the Debtor enjoys a forty percent profit margin) at $100 per case, with ten cases of its Private Label Wines, the Debtor would enjoy a gross profit of $368 on the transaction.

12. Unfortunately, because of its ignorance of the Debtor's business, FCC forced the Debtor to sell off its inventory in basically a "quick sale" manner at huge discounts, depriving the Debtor of sufficient inventory of Highly Rated Wines to bundle with the Private Label wines to sell a significant amount of Private Label wines and increase its cash on hand. Thus, without offering to bundle the Private Label with the more desirable Highly Rated Wines, the retailers were not likely to purchase greater amounts of the Private Label wines as was customarily the Debtor's practice before FCC demanded the wholesale liquidation of its inventory. In simple terms, without additional core inventory, the Debtor cannot make money.

13. Since FCC severely restricted the amount of money it was willing to lend to the Debtor for operational costs, the Debtor was unable to buy the appropriate mix of wines to enable it to effectively increase its profit.

14. Despite the fact that the Debtor complied with FCC's requests to reduce inventory, on December 8, 2008, FCC unilaterally reduced the loan availability on inventory from 60% to 50%. By July 2009, the Debtor was in dire financial straights, not only because it lacked sufficient inventory, but also because it paid down FCC's loan balance from $6.25 million in October 2008 to $3.35 million in July 2009. This severely impacted cash flow to the point of near paralysis, resulting in the Debtor's virtual inability to purchase fresh inventory.

15. The Debtor has attempted to negotiate with FCC for several months on various financing options, but FCC insisted on terms which would benefit no party but FCC. In early August 2009, FCC offered to increase inventory availability to 55%, but only if Capstone contributed another $250,000 in subordinated debt that would not be repaid until inventory availability was once again reduced to 50% in December of 2009.

16. More egregious was FCC's actions in negotiating the terms of a DIP financing facility. FCC offered the DIP facility only to gain additional benefits to which a pre-petition lender is not otherwise entitled. At the last minute, the Debtor opted to withdraw its motion to approve a DIP loan agreement. It was not a decision the Debtor entered into lightly. However, the Debtor withdrew the DIP motion for several reasons.

17. First, the United States Trustee balked at provisions that it characterized as overreaching on FCC's part, including – liens on avoidance actions; deadline of the Committee or a creditor to object; and the releases from the Debtor and all non-Debtor borrowers. However, FCC refused to delete these provisions.

18. The Debtor also decided to withdraw the motion based on the realization, upon further discussions with FCC, that there would be little or no additional availability in excess of the outstanding loans to fund the Debtor's operations as initially had been promised. Thus, the DIP purportedly to be provided by FCC was illusory and served only to protect FCC with additional securities not available to a prepetition lender. For example, the DIP provided FCC with numerous safeguards such as a superpriority administrative claim; releases from the Debtor; increase in interest rate and fees; the roll-up of pre-petition debt into post-petition debt. Because FCC demanded general releases from the Debtor and its Chief Executive Officer, Joern Tittel, FCC sought to immunize itself from the Debtor's and Tittel's potential lender liability claims

against it. FCC also sought the ability to unilaterally create reserves against availability. Each of these terms was detrimental to the Debtor.

19. FCC suggests that the only reason the Debtor withdrew the DIP motion is because the Debtor seeks a $1 million carve out for professional fees. However, as evidenced by the DIP motion, the parties agreed on a $400,000 carve out. What FCC fails to mention is that the Debtor offered to reduce the carve-out request to $300,000, but FCC rejected the offer. Instead, FCC elected to reduce the carve-out to a mere $40,000. The Debtor believes that a carve out is appropriate because, as is evidenced by the Objection, FCC is an aggressive lender that needs to be monitored by a Creditors' Committee. Absent access to a carve out, the Committee cannot retain counsel and would not be adequately represented in the case.

20. Aside from its misrepresentations about why the Debtor withdrew the DIP motion, FCC also grossly minimizes its equity cushion. Based upon the most recent appraisal prepared by Great American, at FCC's request and for its benefit, the net recovery value of the inventory was 63.6%. An analysis of the existing mix of wines and inventory levels indicates that the recovery value percentage is substantially the same today. This results in FCC's collateral position being overcollateralized by approximately $1.4 million.

21. FCC further argues that the Debtor cannot adequately protect FCC against the diminution in the value of its collateral. In point of fact, the evidence will demonstrate that any alleged deterioration of the recovery value of FCC's collateral is, at most, $250,000 over the projected budget period, not the $700,000 alleged by FCC.

22. In essence, FCC's objection mirrors its actions which caused the decline of the Debtor's business. The Court cannot grant FCC what it desires– to liquidate the Debtor for

FCC's sole benefit to the detriment of other creditors.[2] The Debtor is eminently savable. With use of cash collateral, the Debtor will be able to acquire fresh inventory – much of which is presently sitting in containers in various international ports – to bundle in a manner that has demonstrated profitability. Given use of cash collateral, the Debtor would be able to revitalize its business without the interference and direct involvement of the lender, particularly when the lender knows nothing about the industry in general and the Debtor's business in particular.

## ARGUMENT

23. FCC's only arguments in requesting denial of the Cash Collateral Motion are: (i) it will not be adequately protected; and (ii) the degree to which FCC is over-collateralized cannot yet be determined. However, as demonstrated by the most recent appraisal of Great American, FCC has a substantial equity cushion and therefore does not require adequate protection payments.

24. Courts within this Circuit recognize that a significant equity cushion in and of itself might suffice as adequate protection. A secured creditor is adequately protected when the value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim. *See, e.g., Capital Communications Fed. Credit Union v. Boodrow*, 197 B.R. 409, 413 (N.D.N.Y. 1996) (recognizing ten percent of equity cushion adequately protects a creditor), *aff'd*, 126 F.3d 43 (2d Cir. 1997); *In re Lafayette Hotel Partnership*, 227 B.R. 445, 453 (S.D.N.Y. 1998) (holding that sufficient equity cushion is appropriate adequate protection); *In re Realty Southwest Associates*, 140 B.R. 360, 366 (Bankr. S.D.N.Y 1992) (recognizing that

---

[2] FCC also improperly alleges that the Debtor deliberately diverted $115,000 in accounts receivable from FCC without Court approval. As are FCC's other assertions, this is a gross distortion of the record. The Debtor used the $60,057.31 in the JPMorgan account on August 31, 2009 to fund its payroll obligations, which it would not have been able to do because FCC refused to honor its obligations and lend to the Debtor at the 60% advance rate. Left with no choice, the Debtor was forced to put those receivables into its operating account, rather than the lockbox. This lack of funding is exactly what precipitated the Debtor's chapter 11 filing. The remaining $55,635.24 was placed in the DIP account and used post-petition in accordance with the Court's order at the interim hearing. Had the Debtor not done so, it would have lost its key employees and devastated the business.

substantial equity cushion adequately protects creditor); *In re Gaslight Village, Inc.*, 8 B.R. 866 (Bankr. CT 1981) (equity cushion might constitute adequate protection). In fact, the only case on which FCC relies on for support recognizes that "the existence of an equity cushion alone can constitute adequate protection." *See Sharon Steel Corp. v. Citibank (In re Sharon Steel Corp.)*, 159 B.R. 165, 169 (Bankr. W.D.Pa. 1993). In *Sharon Steel Corp.*, the Court found that the equity cushion was not adequate because the Debtor had a history of operating at significant losses and reorganization was speculative. *Id.* at 169-170.

25.  FCC acknowledges that it enjoys an equity cushion, however, it deliberately mischaracterizes that equity cushion as "nominal." See the Objection at ¶1. In January 2009, FCC commissioned Great American to appraise the value of the collateral. That appraisal, based on the inventory as it existed in November 2008, demonstrated that the Debtor's inventory was valued at $8.4 million and the net recovery value of the inventory was approximately 63% or $5.8 million. That inventory was performed in the midst of the nation's financial crisis, when the impact had already been felt; nothing has changed environmentally which would impact the validity of that appraisal. The Debtor's CEO will testify that its current inventory valued at approximately $5.4 million contains a similar mix that would allow the recovery ratio to remain at 63%. Accordingly, the net recovery value of the Debtor's current inventory is $3.8 million, giving FCC a $400,000 equity cushion over its $3.4 million loan balance. In addition, FCC holds a lien on the Debtor's accounts receivable it labels as "eligible". The Debtor estimates the net recovery value of those accounts receivable at approximately $1.0 million. In addition, FCC currently holds more than $200,000 in cash in a lock box. This gives FCC a grand total of $1.6 million equity cushion. In fact, given the Debtor's intent to purchase more collateral, FCC's

equity cushion will likely increase and not diminish because we have offered to give it replacement liens.

26.     FCC claims that its equity cushion will diminish in value by more than $765,000 during the time frame set forth in the Budget.  FCC purposely looks at the wrong numbers.  FCC presents a loss based on the total dollar value of the loss, not, as it should be examining, the net recovery value of the inventory.  In reality, the net recovery value of the inventory, which was 63.6%, based on the appraisal, remained unchanged.  As a result, the alleged deterioration of the recovery value is, at most, $250,000, not the absurd figure FCC posits.  Accordingly, FCC is not entitled to adequate protection payments.

27.     Although FCC is not entitled to adequate protection payments, the Debtor has nonetheless included interest payments to FCC in its proposed Budget.  FCC overlooks that the summary P&L and the Balance Sheet annexed to the Cash Collateral Motion at Exhibit B acknowledged these interest payments.  The Debtor offer to FCC of replacement liens constitutes adequate protection.  *See In re General Growth Properties, Inc.*, __ B.R. __, 2009 WL 1605896, *9 - *10 (Bankr. S.D.N.Y. May 14, 2009) (approving use of continuing and replacement liens, among other things, as adequate protection for use of cash collateral).

28.     Moreover, unlike the Debtor in *In re Sharon Steel Corp.*, the Debtor here has demonstrated that its business model, absent interference by FCC, is not only viable, but profitable.  In 2008, despite the greatest economic downturn since the 1930's, the Debtor increased its sales by two percent, outpacing industry standards.  The Debtor's profit margins have declined not because the Debtor has suddenly turned incapable of selling wine for a profit, but because FCC insisted on below cost sales of inventory regardless of profits or consequences.

If the Debtor is able to replenish its inventory so that it can acquire the appropriate mix of wines to enable it to effectively bundle its sale of wines, the Debtor can return to profitability.

29. It is clear, therefore, that FCC is adequately protected and, as such, the Cash Collateral Motion must be granted.

**CONCLUSION**

30. The Debtor respectfully submits that the protections proposed by the Cash Collateral Motion are appropriate to adequately protect FCC's security interests, and that the Debtor has provided sufficient factual information to make this determination. Accordingly, the Court should authorize the Debtor's use of cash collateral in accordance with the Budget annexed as Exhibit B to the Cash Collateral Motion.

Dated: New York, New York
September 17. 2009

ANDERSON KILL & OLICK, P.C.

By: /s/ Todd E. Duffy
Todd E. Duffy
Dennis J. Nolan
1251 Avenue of the Americas
New York, New York 10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733
*Proposed Attorneys for the Debtor and Debtor-in-Possession*